UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-24551-Civ-MARTINEZ
        (09-21010-Cr-MARTINEZ)
MAGISTRATE JUDGE P.A. WHITE

JEAN RENE DUPERVAL,

    Movant,

v.                                        REPORT OF
                                   MAGISTRATE JUDGE

UNITED STATES OF AMERICA,

    Respondent.
_____/

## I. **Introduction**

The *pro se* movant, Jean Rene Duperval, has filed this motion to vacate pursuant to 28 U.S.C. §2255, challenging the constitutionality of his convictions and sentences entered following a jury verdict in case no. 09-21010-Cr-Martinez.

This Cause has been referred to the Undersigned for consideration and report pursuant to 28 U.S.C. §636(b)(1)(B),©; S.D.Fla. Local Rule 1(f) governing Magistrate Judges, S.D. Fla. Admin. Order 2003-19; and, Rules 8 and 10 Governing Section 2255 Cases in the United States District Courts.

The Court has reviewed the movant's motion (CV-DE#1), the government's answer (CV-DE#9) with attached exhibits, the movant's replies (CV-DE#s 10, 11, 12, 13, 14), together with the Presentence Investigation Report ("PSI"), Statement of Reasons ("SOR"), and all pertinent portions of the underlying criminal file under attack here, including the trial and sentencing transcripts.[1]

---

[1] The undersigned takes judicial notice of its own records as contained on CM/ECF in those proceedings. See Fed.R.Evid. 201.

## II. <u>Claims</u>

This court, recognizing that movant is *pro se,* afforded him liberal construction pursuant to <u>Haines v. Kerner</u>, 404 U.S. 419 (1972). As can best be discerned, in his §2255 motion the movant raises the following grounds for relief, as follows:

**Claim 1:** Ineffective assistance of trial counsel for failing to challenge the court's subject matter jurisdiction (Cv-DE#1:8-14).

**Claim 2:** Ineffective assistance of trial counsel for failing to use factual evidence to impeach a government expert witness on Haitian law. (Cv-DE#1:11-14).

**Claim 3:** Ineffective assistance of trial counsel for improperly conceding the government's allegation that Petitioner was a government official, thereby compromising his requested defense. (Cv-DE#1:14-16).

**Claim 4:** Ineffective assistance of trial counsel for failing to raise prosecutorial misconduct or improper tapering with the evidence. (Cv-DE#1:16-18).

**Claim 5:** The trial court lacked subject matter jurisdiction to try the case and/or impose sentence. (Cv-DE#1:18-24).

**Claim 6:** He was actually innocent of the crime. (Cv-DE#1:24-25).

## III. <u>Factual and Procedural History</u>

In a published opinion, the Eleventh Circuit provided much of the following procedural and factual background.

A federal grand jury . . . returned a second superseding indictment that charged Duperval with two counts of conspiring to commit money laundering, 18 U.S.C. §1956(h), and 19 counts of concealment of money laundering, <u>id.</u> §1956(a)(1)(B)(i). This indictment also alleged that Duperval's financial transactions involved

2

the proceeds of violations of the Foreign Corrupt
Practices Act, 15 U.S.C. §§78dd-1 to -3.

United States v. Duperval, 777 F.3d 1324, 1329 (11th Cir. 2015).

Duperval worked as the Director of International Affairs
at Telecommunications D'Haiti, a company owned by the
government of Haiti. Duperval participated in two schemes
in which international companies gave him bribes in
exchange for favors from Teleco.

Id. at 1327-28.

*The Two Schemes to Provide Bribes to Duperval.*

From June 2003 to April 2004, Duperval was the Assistant
Director General and Director of International Affairs
for Teleco. In that role, Duperval managed contracts with
foreign telecommunication companies. Duperval
participated in two schemes in which companies provided
him with payments in exchange for favors from Teleco.

The first scheme involved Terra Telecommunications
Corporation and its representatives, Joel Esquenazi and
Carlos Rodriguez. Robert Antoine served as the Director
of International Affairs at Teleco before Duperval and
had an agreement with Terra in which Antoine reduced
amounts owed to Teleco and Terra paid Antoine half of the
reduction. Shortly after Duperval was named the Director
of International Affairs, he began to receive these
bribes. Duperval also received $10,000 and a Rolex watch
for his assistance in renewing the contract with Terra.

The second scheme involved Cinergy Telecommunications,
Inc., and its representatives, Washington Vasconez Cruz,
Cecilia Zurita, and Amadeus Richers. While Antoine worked
at Teleco, he helped Cinergy enter into an agreement with
Teleco, and Cinergy paid Antoine about $150,000 as a
reward. After Teleco fired Antoine, Cinergy hired him as
a consultant. In August 2003, the agreement between
Cinergy and Teleco was about to expire, and Cinergy was
concerned that Teleco would not renew the contract.
Antoine met with Duperval and offered Duperval 50 percent
of his consulting fee if Teleco renewed the contract.
Duperval agreed to help but demanded 60 percent. Teleco
maintained its contract with Cinergy, and Duperval
received two cents for every minute that was added to the

3

contract, for a total of about $150,000.

Duperval had Cinergy and Terra pay the bribes to two companies. Duperval first used Crossover Records, a music company owned by his brother, Lionel Duperval. Cinergy wrote five checks, for a total of $142,460, to Crossover as payments for Duperval. Duperval later established a shell company, Telecom Consulting Services Corporation, with the help of Esquenazi, a co-owner of Terra. Duperval's sister, Marguerite Grandison, served as the president of Telecom and operated its checking account. Duperval's name did not appear on any of the corporate documents. After Grandison and Esquenazi signed a commission agreement between Telecom and Terra, Terra made seven wire transfers to Telecom that Terra described as "consulting fees." Terra transferred a total of $75,000 to Telecom. Cinergy also paid a total of $257,339.68 to Duperval through Telecom.

Duperval then transferred the money to himself. Crossover made three wire transfers, for a total of about $93,000, to Duperval's personal account. Grandison wrote 20 checks to Duperval that were drawn on the checking account of Telecom. Each check was for less than $10,000, and they totaled $63,577.64. Grandison also wrote checks to cash, and Duperval used other checks to purchase a house for himself, pay his mortgage, contribute to college funds, and purchase other personal items.

Id. at 1328.

To establish that Duperval laundered the proceeds of illegal activity, the government introduced evidence that Duperval's co-conspirators violated the Foreign Corrupt Practices Act, id. §78dd-2. The government presented the testimony of Louis Gary Lissade, the former Minister of Justice of Haiti and the author of a book on public administration in Haiti. Lissade testified that Teleco was part of the public administration in Haiti.

Duperval testified in his own defense. Duperval admitted that he received money from Cinergy and Terra, but he asserted that the money was for doing a good job in the administration of the contracts. Duperval's counsel requested a jury instruction based on an exception to the Act for routine governmental action, id. §78dd-2(b), but the district court denied this request.

4

A jury convicted Duperval on all counts.

Id. at 1330-31.

Prior to sentencing, a PSI was prepared, which provided as follows: The base offense level was taken from the underlying offense from which the laundered funds were derived, namely, wire fraud in violation of 18 U.S.C. §1343 and the guideline for this offense, found in §2B1.1. The base offense level started at six, pursuant to §2B1.1(a)(2), the Petitioner was responsible for $497,331.68, therefore, 14 levels were added, pursuant to §2B1.1(b)(2)(H). Two levels were added, pursuant to §2B1.1(b)(9)(B), because a substantial part of the fraudulent scheme was committed outside of the United States. In light of the foregoing, the base offense level was set at 22. (PSI ¶70).

Because the offense of conviction was a violation of 18 U.S.C. §1956, the offense level was increased by two levels, §2S1.1(b)(2)(B). (PSI ¶71). Because the offense of conviction was a violation of 18 U.S.C. §1956 and involved sophisticated laundering, the offense level was increased by two levels, §2B1.1(b)(3). (PSI ¶72). Because the defendant was a manager or supervisor (but not an organizer) and the criminal activity involved five or more participants or was otherwise extensive, the offense level was increased by three levels, §3B1.1(b). (PDI ¶74). Because the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction and the obstructive conduct related to the defendant's offense of conviction and any relevant conduct or a closely related offense, the offense level was increased by two levels, §3C1.1. (PSI ¶75). The total offense level was set at 31.

(PSI ¶79).

Petitioner had zero criminal history points and a criminal history category of I. (PSI ¶82).

Statutorily, as to each of Count 8 through 28, the term of imprisonment was 0 to 20 years, 18 U.S.C. § 1956(a)(1)(B)(i). (PSI ¶109). Based on a total offense level of 31 and a criminal history category of I, the guideline imprisonment range was 108 to 135 months. (PSI ¶110).

The trial court sentenced Petitioner at the low end for a total of 108 months in prison. (Cr DE# 816). Petitioner appealed, and on February 9, 2015, the Eleventh Circuit affirmed Petitioner's convictions. United States v. Duperval, 777 F.3d 1324 (11th Cir. 2015). Petitioner's petition for writ of certiorari was denied on January 11, 2016. United States v. Duperval, 136 S. Ct. 859 (2016).

Absent evidence to the contrary, it appears the movant returned to this court filing his initial §2255 motion on **October 31, 2016,** after he signed the motion and then handed it to prison authorities for mailing in accordance with the mailbox rule, as is evident from review of the prepaid first class postage.[2] (Cv-DE#1:26).

---

[2] "Under the prison mailbox rule, a *pro se* prisoner's court filing is deemed filed on the date it is delivered to prison authorities for mailing." Williams v. McNeil, 557 F.3d 1287, 1290 n.2 (11th Cir. 2009); see Fed.R.App. 4(c)(1) ("If an inmate confined in an institution files a notice of appeal in either a civil or a criminal case, the notice is timely if it is deposited in the institution's internal mail system on or before the last day for filing."). Unless there is evidence to the contrary, like prison logs or other records, a prisoner's motion is deemed delivered to prison authorities on the day he signed it. See Washington v. United States, 243 F.3d 1299, 1301 (11th Cir. 2001); Adams v. United States, 173 F.3d 1339 (11th Cir. 1999) (prisoner's pleading is deemed filed when executed and delivered to prison authorities for mailing).

## IV. <u>Threshold Issues-Timeliness</u>

The government rightfully does not challenge the timeliness of the movant's operative §2255 motion (Cv-DE#9). <u>See</u> 28 U.S.C. §2255(f).

## V. <u>General Legal Principles</u>

Because collateral review is not a substitute for direct appeal, the grounds for collateral attack on final judgments pursuant to §2255 are extremely limited. A prisoner is entitled to relief under §2255 if the court imposed a sentence that (1) violated the Constitution or laws of the United States, (2) exceeded its jurisdiction, (3) exceeded the maximum authorized by law, or (4) is otherwise subject to collateral attack. <u>See</u> 28 U.S.C. §2255(a); <u>McKay v. United States</u>, 657 F.3d 1190, 1194 n.8 (11th Cir. 2011). "Relief under 28 U.S.C. §2255 'is reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised in direct appeal and would, if condoned, result in a complete miscarriage of justice.'" <u>Lynn v. United States</u>, 365 F.3d 1225, 1232 (11th Cir. 2004)(citations omitted). The "fundamental miscarriage of justice" exception recognized in <u>Murray v. Carrier</u>, 477 U.S. 478, 496 (1986), provides that it must be shown that the alleged constitutional violation "has probably resulted in the conviction of one who is actually innocent ...."

The law is well established that a district court need not reconsider issues raised in a section 2255 motion which have been resolved on direct appeal. <u>Rozier v. United States</u>, 701 F.3d 681, 684 (11th Cir. 2012); <u>United States v. Nyhuis</u>, 211 F.3d 1340, 1343 (11th Cir. 2000); <u>Mills v. United States</u>, 36 F.3d 1052, 1056 (11th Cir. 1994); <u>United States v. Rowan</u>, 663 F.2d 1034, 1035 (11th Cir.

7

1981). Once a matter has been decided adversely to a defendant on direct appeal, it cannot be re-litigated in a collateral attack under section 2255. <u>Nyhuis</u>, 211 F.3d at 1343 (quotation omitted). Broad discretion is afforded to a court's determination of whether a particular claim has been previously raised. <u>Sanders v. United States</u>, 373 U.S. 1, 16, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963) ("identical grounds may often be proved by different factual allegations ... or supported by different legal arguments ... or couched in different language ... or vary in immaterial respects").

The movant raises multiple claims challenging counsel's effectiveness during all stages of the proceeding. The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to the assistance of counsel during criminal proceedings against them. <u>Strickland v. Washington</u>, 466 U.S. 668, 684-85, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). When assessing counsel's performance under <u>Strickland</u>, the Court employs a strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." <u>Id</u>. at 690. "[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance ...." <u>Burt v. Titlow</u>, ___ U.S. ___, 134 S.Ct. 10, 18, 187 L.Ed.2d 348 (2013). To prevail on a claim of ineffective assistance of counsel, the movant must demonstrate (1) that his counsel's performance was deficient, i.e., the performance fell below an objective standard of reasonableness, and (2) that he suffered prejudice as a result of that deficient performance. <u>Strickland</u>, 466 U.S. at 687-88.

To establish deficient performance, the movant must show that, in light of all the circumstances, counsel's performance was outside the wide range of professional competence. <u>Strickland</u>,

supra. See also Cummings v. Sec'y for Dep't of Corr's, 588 F.3d 1331, 1356 (11th Cir. 2009)("To establish deficient performance, a defendant must show that his counsel's representation fell below an objective standard of reasonableness in light of prevailing professional norms at the time the representation took place.")(internal quotation marks omitted). The Court's review of counsel's performance should focus on "not what is possible or what is prudent or appropriate but only [on] what is constitutionally compelled." Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000)(en banc), cert. den'd, 531 U.S. 1204 (2001)(quoting Burger v. Kemp, 483 U.S. 776, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987)). There are no absolute rules dictating what is reasonable performance because absolute rules would restrict the wide latitude counsel have in making tactical decisions. Id. at 1317. The test for ineffectiveness is not whether counsel could have done more; perfection is not required. Nor is the test whether the best criminal defense attorneys might have done more. Chandler, 218 F.3d at 1313. Instead, the test is whether what counsel did was within the wide range of reasonable professional assistance. Id. at 1313 n.12.

Regarding the prejudice component, the Supreme Court has explained "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. In assessing whether a particular counsel's performance was constitutionally deficient, courts indulge a strong presumption that counsel's conduct falls within the wide range of reasonable assistance. Strickland, 466 U.S. at 689. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. A court need not address both prongs of Strickland if the defendant makes an insufficient

showing on one of the prongs. Stickland, 466 U.S. at 697. See also
Brown v. United States, 720 F.3d 1316, 1326 (11 Cir. 2013); Butcher
v. United States, 368 F.3d 1290, 1293 (11 Cir. 2004). Further,
counsel is not ineffective for failing to raise non-meritorious
issues. Chandler v. Moore, 240 F.3d 907, 917 (11 Cir. 2001).
Moreover, counsel is not required to present every non-frivolous
argument. Dell v. United States, 710 F.3d 1267, 1282 (11 Cir.
2013).

A court must adhere to a strong presumption that "counsel's
conduct falls within the wide range of reasonable professional
assistance." Strickland, 466 U.S. at 689. Strategic choices made
after thorough investigation of the law and facts relevant to
plausible options are virtually unchallengeable. Id. at 690-91. To
uphold a lawyer's strategy, the Court need not attempt to divine
the lawyer's mental processes underlying the strategy. "There are
countless ways to provide effective assistance in any given case."
Strickland, 466 U.S. at 689. No lawyer can be expected to have
considered all of the ways. Chandler, 218 F.3d at 1316.

Since the sentence ultimately imposed upon the defendant is a
"result of the proceeding," in order for a petitioner to satisfy
the prejudice-prong of Strickland, he must demonstrate that there
is a reasonable probability that his sentence would have been
different but for his trial counsel's errors. See United States v.
Boone, 62 F.3d 323, 327 (10th Cir.)(rejecting the defendant's claim
that counsel was ineffective in part because the defendant failed
to show "that the resulting sentence would have been different than
that imposed under the Sentencing Guidelines"), cert. denied, 516
U.S. 1014 (1995). Thus, the Strickland test applies to claims
involving ineffective assistance of counsel during the punishment
phase of a non-capital case. See Glover v. United States, 531 U.S.

10

198 (2001)(holding "that if an increased prison term did flow from
an error [of counsel] the petitioner has established Strickland
prejudice"); Spriggs v. Collins, 993 F.2d 85, 88 (5th Cir. 1993).
If the petitioner cannot meet one of Strickland's prongs, the court
does not need to address the other prong. Strickland, 466 U.S. at
687, 104 S.Ct. at 2064. See also Butcher v. United States, 368 F.3d
1290, 1293 (11th Cir. 2004).

Furthermore, a §2255 movant must provide factual support for
his contentions regarding counsel's performance. Smith v. White,
815 F.2d 1401, 1406-07 (11th Cir.1987). Bare, conclusory allegations
of   ineffective   assistance   are   insufficient   to   satisfy   the
Strickland test. See Boyd v. Comm'r, Ala. Dep't of Corr's, 697 F.3d
1320,  1333-34  (11th  Cir.  2012);  Garcia  v.  United  States,  456
Fed.Appx. 804, 807 (11th Cir. 2012) (citing Yeck v. Goodwin, 985
F.2d 538, 542 (11th Cir. 1993)); Wilson v. United States, 962 F.2d
996, 998 (11th Cir. 1992); Tejada v. Dugger, 941 F.2d 1551, 1559
(11th  Cir.  1991);  Stano  v.  Dugger,  901  F.2d  898,  899  (11th  Cir.
1990)(citing Blackledge v. Allison, 431 U.S. 63, 74, 97 S.Ct. 1621,
52 L.Ed.2d 136 (1977)); United States v. Ross, 147 F. App'x 936,
939 (11th Cir. 2005).

Finally, the Eleventh Circuit has recognized that the test is
not what the best lawyers would have done or even what most good
lawyers would have done, but rather whether some reasonable lawyer
could have acted in the circumstances as defense counsel acted.
Williamson v. Moore, 221 F.3d 1177, 1180 (11th Cir. 2000). "Even if
counsel's decision appears to have been unwise in retrospect, the
decision will be held to have been ineffective assistance only if
it was 'so patently unreasonable that no competent attorney would
have chosen it.'" Dingle, 480 F.3d at 1099 (quoting Adams v.
Wainwright, 709 F.2d 1443, 1445 (11th Cir. 1983)). The Sixth Circuit

11

has framed the question as not whether counsel was inadequate, but was counsel's performance was so manifestly ineffective that "defeat was snatched from the hands of probable victory." United States v. Morrow, 977 F.2d 222, 229 (6th Cir. 1992).

As will be demonstrated in more detail below, the movant is not entitled to vacatur on the claims presented.[3] When viewing the evidence in this case in its entirety, the alleged errors raised in this collateral proceeding, neither individually nor cumulatively, infused the proceedings with unfairness as to deny the movant a fundamentally trial and due process of law. The movant therefore is not entitled to habeas corpus relief. See Fuller v. Roe, 182 F.3d 699, 704 (9th Cir. 1999)(holding in federal habeas corpus proceeding that where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation), overruled on other grounds, Slack v. McDaniel, 529 U.S. 473, 482 (2000). See also United States v. Rivera, 900 F.2d 1462, 1470 (10th Cir. 1990)(stating that "a cumulative-error analysis aggregates only actual errors to determine their cumulative effect."). Contrary to the movant's apparent assertions, the result of the proceedings were not fundamentally unfair or unreliable. See Lockhart v. Fretwell, 506 U.S. 364, 369-70 (1993).

## VI. **Discussion**[4]

---

[3]Briefly, the evidence against the movant was more than sufficient to support his convictions. The movant has not shown that the result of the trial or appeal would have been affected had counsel proceeded differently. Further, no denial of due process has been demonstrated. To the contrary, it is clear after independent review of the record that the movant received a fair trial, and that no constitutional violations occurred. Consequently, he has failed to demonstrate that he is entitled to relief in this collateral proceeding.

[4]To the extent the movant has raised new facts and provided new evidence to the undersigned, for the first time, in his traverse, something which is precluded under federal case law, it has been reviewed and considered herein. However, if the movant again attempts to raise new arguments or grounds for

Under **claim 1**, Petitioner alleges ineffective assistance of trial counsel for failing to challenge the court's subject matter jurisdiction. (Cv-DE#1:8-14).

"Subject matter jurisdiction defines the court's authority to hear a given type of case." Moreno v. United States, 510 F.Supp.2d 780, 784 (M.D. Fla. 2007) (citing United States v. Morton, 467 U.S. 822, 828, (1984)). Congress has provided the district courts with original jurisdiction of "all offenses against the laws of the United States." 18 U.S.C. §3231. Money laundering and money laundering conspiracy, with specified unlawful activities of FCPA violations, Haitian bribery law violations, and wire fraud, are offenses against the United States. 18 U.S.C. §1956.

Petitioner also claims that he and his counsel "agreed to focus on the Court's jurisdiction, based on the affirmative defense under subsection (c)(1) of 78dd-2 and 78dd3 [the local law defense]." (CV DE#1:4, 19; CV. DE# 1-1:3). The FCPA prohibits offering to pay, paying, promising to pay, or authorizing the payment of money or anything of value to a foreign official in order to influence any act or decision of the foreign official in his or her official capacity or to secure any other improper advantage in order to obtain or retain business. 15 U.S.C.§§ 78dd-2(a), 78dd-3(a). The FCPA provides for two affirmative

---

relief or otherwise provides additional evidence "for the first time in an objections to this Report, the district court may [and should] exercise its discretion and decline to consider the argument" or new facts. Daniel v. Chase Bank USA, N.A., 650 F.Supp.2d 1275, 1278 (N.D. Ga. 2009)(citing Williams v. McNeil, 557 F.3d 1287 (11th Cir. 2009); see also, Starks v. United States, 2010 WL 4192875 at *3 (S.D. Fla. 2010); United States v. Cadieux, 324 F.Supp.2d 168 (D.Me. 2004). "Parties must take before the magistrate, 'not only their best shot but all of the shots.'" Borden v. Sec'y of Health & Human Servs., 836 F.2d 4, 6 (1st Cir. 1987)(quoting Singh v. Superintending Sch. Comm., 593 F.Supp. 1315, 1318 (D.Me. 1984)).

defenses, a local written law defense and the reasonable and bona fide business expense defense. For the local written law defense to apply, a defendant must establish that "the payment, gift, offer, or promise of anything of value that was made, was lawful under the written laws and regulations of the foreign official's, political party's, party official's, or candidate's country." 15 U.S.C. §§78dd-2(c)(1), 78dd3(c)(1).

In creating the local written law defense in 1988, Congress sought "to make clear that the absence of written laws in a foreign official's country would not by itself be sufficient to satisfy this defense." H.R. Rep. No. 100-576, at 922. Rather, bribery must be expressly permitted under the written laws of the foreign country. Accordingly, the local written law affirmative defense is narrow. Even if an "individual is relieved of criminal responsibility for his actions by a provision of the foreign law," a defendant may still "be prosecuted under the FCPA" for engaging in conduct prohibited under foreign law. United States v. Kozeny, 664 F.Supp.2d 369, 395 (S.D.N.Y. 2009); see also United States v. Giffen, 326 F.Supp.2d 497, 503 (S.D.N.Y. 2004) (noting that the defendant had not asserted that the challenged payments were lawful under any Kazakh law).

A local written law defense would have been unavailing here. One of the specified unlawful activities for which Petitioner was convicted of laundering proceeds was the Haitian law prohibiting bribery. Petitioner has provided no evidence that a Haitian law explicitly permitted a company to pay a Teleco official administering its contracts. Further, an affirmative defense, even if successful, does not deprive a court of subject matter jurisdiction. United States v. Najjar, 283 F.3d 1306, 1309 (11th Cir. 2002).

14

Petitioner's core claim is not that this Court lacked subject matter jurisdiction to hear cases involving money laundering (or FCPA) charges, but that he, as a factual matter, was not a foreign government official because the entity for which he worked, Teleco, was not a government instrumentality as defined by the FCPA. This element of the FCPA—whether Teleco was, in fact, a government instrumentality—was a central issue at trial (and on appeal) that Petitioner's counsel vigorously contested. See United States v. Duperval, 777 F.3d 1324, 1333-35 (11th Cir. 2015).

Consequently, Petitioner's claim that counsel was ineffective for not raising an argument concerning the court's subject matter jurisdiction is wholly without merit. Counsel is not ineffective for failing to raise a meritless argument. See, e.g., United States v. Winfield, 960 F.2d 970, 974 (11th Cir. 1992) ("[A] a lawyer's failure to preserve a meritless issue plainly cannot prejudice a client."). Petitioner is not entitled to relief under claim 1.

Under **claim 2**, Petitioner alleges ineffective assistance of trial counsel for failing to use factual evidence to impeach a government expert witness on Haitian law. (Cv-DE#1:11-14). Petitioner argues that his counsel was ineffective for not doing a better job proving to the jury that Teleco was not a government instrumentality. Petitioner's claim fails for several reasons: (I) the Eleventh Circuit has twice held that Teleco was a government instrumentality "under almost any definition we could craft," United States v. Esquenazi, 752 F.3d 912, 925 (11th Cir. 2014); (II) trial counsel's  strategic decision concerning how to address the issue of Teleco's status was influenced by the prior trial of Petitioner's co-conspirators; (III) Petitioner's counsel did in fact forcefully contest Teleco's status, raising nearly all of the

arguments Petitioner now makes, and appropriately and strategically handled cross-examination of the Government's expert witness on Haitian law; and (IV) Petitioner now provides argument and evidence which trial counsel did in fact present to the jury.

(I)  The  Eleventh  Circuit,  in  two  decisions  involving Petitioner and his co-conspirators, has twice held that Teleco is a government instrumentality. Esquenazi, 752 F.3d at 925 and United States v. Duperval, 777 F.3d 1324, 1333-34 (11th Cir. 2015). In those  cases,  the  Eleventh  Circuit   held  that  a  government instrumentality is "'an entity controlled by the government of a foreign country that performs a function the controlling government treats as its own.'" Duperval, 777 F.3d at 1333 (citing Esquenazi, 752 F.3d at 925). The court explained that:

> [t]o determine if the government controls the entity, the fact-finder should consider the following several factors: "the foreign government's formal designation of that entity; whether the government has a majority interest in the entity; the government's ability to hire and fire the entity's principals; the extent to which the entity's profits, if any, go directly into the governmental fisc, and by the same token, the extent to which the government funds the entity if it fails to break even; and the length of time these indicia have existed."

Id.

> [T]o determine if the entity performs a function that the government treats as its own, the fact finder should consider the following several factors: "whether the entity has a monopoly over the function it exists to carry out; whether the government subsidizes the costs associated with the entity providing services; whether the entity provides services to the public at large in the foreign country; and whether the public and the government of that foreign country generally perceive the entity to be performing a governmental function."

16

Id. (citing Esquenazi, 752 F.3d at 926).

As the Eleventh Circuit noted, both Petitioner's and his co-conspirators' trials presented "almost identical evidence" about Teleco's status, including that Teleco was 97% owned by the Central Bank of Haiti, the government had owned its interest since about 1971, the government appointed the board of directors and general director of Teleco, the government issued Teleco a monopoly over telecommunications services, and that Teleco was widely considered to be a public institution. Id. In both decisions, the Eleventh Circuit held that a jury could have reasonably found that Teleco was an instrumentality of Haiti. Id. at 1333-34; Esquenazi, 752 F.3d at 929.

Although both of these decisions were issued after Petitioner's trial, the law is still controlling concerning what a government instrumentality is under the FCPA. Petitioner argues that his counsel was ineffective at making arguments concerning Teleco's formal nature. However, given the functional standard laid out by the Eleventh Circuit, Petitioner's prime argument that Teleco is not a government instrumentality because its status was never formally, legally changed is unavailing. His counsel could not have been ineffective by failing to make a meritless argument and thus Duperval was in no way prejudiced. Card v. Dugger, 911 F.2d 1494, 1520 (11th Cir. 1990) ("Counsel cannot be labeled ineffective for failing to raise issues which have no merit.").

(II) Petitioner and his counsel faced advantages and disadvantages in contesting Teleco's status because the facts and law had been litigated the previous year, at the trial of Petitioner's codefendants Esquenazi and Rodriguez. Undoubtedly, the successes and failures of the first trial influenced his counsel's

strategy. Petitioner's counsel had the advantage of having heard the Government expert's prior testimony. He therefore knew in advance what problematic aspects of Teleco's nature he would likely be able to elicit without the strategic danger of calling a defense expert witness.

On the other hand, Petitioner's counsel did not have a clean slate on which to litigate. The issue of Teleco's status had been vigorously litigated in the Esquenazi trial, with multiple competing jury instructions, briefings, and arguments. (CR DE# 283, 309, 403, 404, 405, 409, 416). As the salient facts and law had already been before this Court, Petitioner's counsel's strategic choices were constrained as a practical matter. (CR DE# 609:5-7, summarizing the evidence that Teleco was a government instrumentality). The strategic choice that Petitioner's counsel made—to use the Government's own expert witness to bring out the most important defense points concerning Teleco's nature for the benefit of the jury—was reasonable one under the circumstances.

(III) Most of the facts concerning Teleco's history are not contested by Petitioner or any of the sources he cites. Petitioner's counsel accepted the basic facts about Teleco and emphasized and contested the points that were most favorable to Petitioner. As explained by the Government's Haitian law expert witness and former Minister of Justice of Haiti, Gary Lissade, Teleco began as a private company owned by private individuals in 1968. (CR DE# 771:435). Teleco executed a contract with the government that gave the company a monopoly over telecommunications in Haiti but mandated some obligations, like Haitian government representation on the board. (CR DE# 771 at 435-36). Three or four years later, however, the company became 97% owned by the Central Bank of Haiti. (CR DE# 771 at 436-38). According to Lissade, how

this transformation occurred, or what happened to the other three percent of Teleco's shares, is a mystery. (CR DE# 771 at 439-40). No law officially changed Teleco's status from a private to a mixed public/private company, but, as a factual matter, the change occurred. (CR DE# 771 at 440).  Teleco started referring to itself with the suffix, S.A.M. for Society Anonymous Mixed instead of S.A. for Society Anonymous, reflecting this change. (Id.). During the period relevant to Petitioner's prosecution, Teleco's ownership by Haiti's Central Bank remained unchanged. (CR DE# 771 at 441, 458).

The Government introduced exhibits and elicited testimony from Lissade to further delve into Teleco's status, including that its board of directors and general director were appointed by executive order of the President of Haiti, Prime Minister of Haiti, and various Haitian Ministers. (CR DE# 771 at 441-44). Indeed, Petitioner himself testified that he obtained his employment at Teleco from President Aristide of Haiti after a meeting with the President. (CR DE# 772 at 683-85, 781-82). Furthermore, the Government introduced evidence that Teleco's revenues are controlled by Haiti's Central Bank and various laws in Haiti referred to Teleco, either directly or indirectly, as part of Haiti's public administration. (CR DE# 771 at 456).

With these facts as a backdrop, Petitioner's counsel used his cross-examination of Lissade to cast doubt on Teleco's status as a government instrumentality. The center of his focus on Teleco's status during the cross-examination is the same argument that Petitioner makes now, namely, that no "official legal document" changed the status of Teleco. (CR DE# 771 at 489). Petitioner's counsel elicited from Lissade that Teleco was a "unique case," unlike any other entity in Haiti, for all other mixed public/private corporations had official orders properly changing

their designation. Id. In closing, Petitioner's counsel emphasized the point that no "order or decree" changed Teleco's "status officially." (CR DE# 774 at 936).

In addition, Petitioner's counsel made many discrete points concerning Teleco's nature during the same cross-examination. For example, he elicited agreement from Lissade that most of the Haitian government—including its executive branch, its judiciary, and its military—was funded by the national budget, unlike Teleco. (CR DE# 771 at 474-75, 478). He also raised this issue in closing, arguing that Lissade had "conceded" that Teleco was not funded through the budget of Haiti "[l]ike a true government agency," nor were the salaries of Teleco employees "funded by the government budget." (CR DE# 774 at 937). Likewise, Petitioner's counsel, through Lissade, was able to establish that Teleco's employees did not receive government pensions like other civil servants, a point he also emphasized in closing, noting that instead Teleco employees had a private pension plan. (CR DE# 771 at 479, 481, CR DE# 774 at 937). Counsel further argued that Teleco could sue in its own name and hire attorneys of its choosing that were not paid for by the Haitian government. (CR DE# 771 at 479, 937). Likewise, he used this method to establish that Teleco could be sued in the civil courts, the same as a private corporation, and not the administrative courts, which were used for most government institutions. (CR DE# 771 at 485-86).

Petitioner's counsel devoted considerable attention to the issue of Teleco's status, raised many relevant points, and argued these to the jury. In no way can his performance be considered ineffective.

(IV) Petitioner now alleges that he provided his counsel with

20

information that his counsel should have used in his defense. (CV DE# 1 at 11-14; CV DE# 1-1 at 2-4). The overwhelming majority of this information, however, is duplicative of information that Petitioner's counsel had at the time and did in fact use at trial.

First, Petitioner asserts that his counsel should have used information supplied by three potential experts, Camille LeBlanc, Jean Renel Sanon, and Alain Guillaume. (CV DE# 1-1 at 2-3). Petitioner claims that, before trial, he contacted LeBlanc, a Haitian attorney and former Minister of Justice in Haiti, "who supplied evidence and agreed to testify as a defense expert." (CV DE# 1-1 at 2). Petitioner, however, does not supply any correspondence or other documentation to support this claim. To the contrary, the record already reveals that LeBlanc would not have been able to testify. Co-conspirator Joel Esquenazi retained LeBlanc to testify as an expert witness in his trial and submitted an expert notice, (CR DE# 264), but LeBlanc previously represented Robert Antoine, a co-conspirator and cooperating witness who testified at Esquenazi's and Petitioner's trials, and was disqualified by this Court. (CR DE# 291, 310). Petitioner's counsel could not have been ineffective for not calling an expert witness which this court had already disqualified.

Petitioner also claims that he contacted Mr. Jean Renel Sanon, who would later become Minister of Justice in Haiti. (CV DE# 1-1 at 2). Petitioner claims that, in correspondence to his counsel, "Mr. Sanon clearly expressed that Teleco was not a state-owned enterprise, and that its  employees were not subject to criminal proceedings under Article 137 of the Haitian Penal Code." (CV DE# 1-1 at 2). Although counsel did not call Mr. Sanon, he incorporated the information supplied by Mr. Sanon into his cross-examination of Lissade. (CV DE# 9, Ex. A at 3).

Finally, after Petitioner was convicted, Petitioner states that his counsel requested and obtained "information regarding the status of Telecom from another Haitian attorney, Mr. Alain Guillaume (professor of public law)." (CV DE# 1-1 at 3). Petitioner supplies Guillaume's correspondence and statement. (CV DE# 1-1 at 6-9). Petitioner claims that he requested that his counsel submit this evidence to challenge the jurisdiction of the court but that his counsel explained that a notice of appeal had already been filed and that "any new procedure would delay the appeal process." (CV DE# 1-1 at 3).

It appears that Mr. Guillaume's statement did not meet the standard for newly discovered evidence and, thus, any effort to raise it as such would be futile.  The standard for a motion for a new trial based on newly discovered evidence, which Petitioner's counsel would have had to file, requires that "[t]he evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." United States v. Martinez, 763 F.2d 1297, 1313 (11th Cir. 1985). Such a motion based upon Guilluame's statement would have been unlikely to succeed as the statement contained little to no new information warranting a new trial. The major point of Guillame's statement was that "the official status transition of joint-stock (S.A.) to semi-public (S.A.M.) has not been done." (CV DE# 1-1 at 7). Guillaume acknowledges that his opinion does not "take into account any contra legal practices that may have existed at one time or another in the recent history of Haiti," (CV DE# 1-1 at 6), and, thus, does not take into account that, legal formalities aside, the evidence established that Teleco was owned, controlled, and operated as a government entity.  Regardless, as discussed above, Petitioner's counsel had already brought out both these points through his cross-examination of Lissade.

22

Guillaume's statement also explains that Teleco workers did not receive the benefits of civil servants, was not funded by the Haitian government budget, and was not governed by administrative law. (CV DE# 1-1 at 8). Guillaume's statement would have been duplicative as Petitioner's counsel brought out all these points through his cross-examination of Lissade. Guillaume also makes a point that Haiti's Central Bank is "an autonomous body with a legal status separate from the government." (CV DE# 1-1 at 7). However, not only was Haiti's Central Bank's nature discussed at trial, the Government introduced the law creating it as Government's exhibit 456T. (CR DE# 771 at 439).

In sum, there is no evidence that any of the Haitian law experts Petitioner now references were willing and/or able to testify at the time of Petitioner's trial. Nor is there any indication that any of these individuals would have offered information that was not already addressed in court.

Petitioner also claims that his counsel was ineffective by not submitting as evidence other documents he located regarding Teleco's status as a non-governmental entity. However, the majority of the documents Petitioner references had already been discussed or introduced into evidence at trial by the Government or were not helpful to Petitioner's argument that Teleco was not a government instrumentality.

For example, Appendix B is Articles 137 and 140 of the Haitian Penal Code, which were introduced into evidence as Government's Exhibit 457T. (CV DE# 1-1 at 10). Appendix C is an excerpt of the Haitian Constitution relating to regulations of the Haitian civil service. (CV DE# 1-1 at 12). As discussed above, matters concerning the Haitian civil service were brought out by Petitioner's counsel

23

at trial. Further, the Government introduced other evidence
concerning the Haitian civil service, such as a Decree of 17 May
2005 Revising the General Status of the Civil Service, which was
introduced into evidence as Government's exhibit 458T. (CR DE# 771
at 442).

Appendices D and E are letters appointing Petitioner and
accepting his resignation. They do not help Petitioner in that both
are signed by Haitian government officials and are written on
Teleco's stationary with the "S.A.M." designation, which
demonstrates Teleco's mixed public/private nature. (CV DE# 1-1 at
15, 17). They were introduced by the Government as Exhibits 414T
and 415T and discussed with Lissade, who explained that the
appointment letter was "an order" from the Ministry of Public Works
and Transportation. (CR DE# 771 at 453-55).

Appendix F is a budgetary document showing that Teleco was not
included in Haiti's budget. As discussed above, this topic was
covered in defense counsel's cross-examination of Lissade.

Appendix G is a resolution of the general assembly of Natcom
S.A. published on April 21, 2011 that mentions Teleco with the
designation S.A. instead of S.A.M. in 2011. (CV DE# 1-1 at 29-29).
Teleco's privatization was discussed in Lissade's direct testimony,
which occurred after Petitioner's tenure at Teleco. (CR DE# 771 at
458).

Taken together, Petitioner's argument that his counsel was
ineffective in making arguments concerning Teleco's status is
wholly without merit given the record of his counsel's dogged
attempt to highlight the facts favorable to Petitioner on this
point. Further, given the overwhelming evidence of Teleco's status

24

as a government instrumentality as well as the Eleventh Circuit rulings concerning Teleco's status, Petitioner could not have suffered prejudice from any of his counsel's strategic decisions on how to address this issue.

Under **claim 3**, Petitioner alleges ineffective assistance of trial counsel for improperly conceding to the government's allegation that Petitioner was a government official, thereby compromising his requested defense. (Cv-DE#1:14-16). Petitioner claims that in arguing that his actions fell within the "routine government action" exception to the FCPA, his counsel erroneously conceded that he was a government official. He claims that his counsel rendered ineffective assistance because he did not pursue Petitioner's chosen defense that Teleco was not a government entity, and therefore, Petitioner did not qualify as a government official. His claim is refuted by the record.

One aspect of Petitioner's defense was that Petitioner never extended any telecom company a benefit that the telecom company was not due. Petitioner testified consistent with this defense. (CR DE# 773 at 750-800). However, this Court denied Petitioner's requested jury instruction for "routine government action" and this denial was affirmed on appeal. (CR DE# 773 at 863). <u>See also United States v. Duperval</u>, 777 F.3d 1324, 1335 (11th Cir. 2015). Therefore, Petitioner's counsel argued to the jury that Petitioner gave no undue benefits to the telecom companies and that Teleco was not a government instrumentality. Furthermore, because this Court denied Petitioner's request for a "routine government action" exception instruction, Petitioner's counsel made no arguments about the routine government action exception to the jury. Therefore, Petitioner's argument that the routine government action exception put him in the position of arguing potentially inconsistent

defenses—namely, that Petitioner did not work for the government or, in the alternative, preformed merely a routine government action—is refuted by the record. (CV DE# 1 at 14-15).

Petitioner erroneously argues that his counsel abandoned his chosen defense of asserting that Teleco was not a government instrumentality. Indeed, Petitioner concedes that his counsel argued against the Government's assertion that Petitioner was a government official or civil servant. (CV DE# 1 at 14-15). He further concedes that the two documents he wanted counsel to use to argue that Article 137 did not apply – "two letters, one of appointment and the other of termination of employment written on company letterhead, signed by two different members of the board of Teleco acting as such" – were submitted as exhibits and provided to the jury. As discussed in detail above, the record shows that throughout the trial, Petitioner's counsel repeatedly challenged the Government's argument that Teleco was a government instrumentality and that Petitioner was a government official.

Accordingly, Petitioner fails to satisfy both prongs of <u>Strickland</u> in that he cannot show deficient performance by counsel and cannot show prejudice as a result of counsel's actions.

Under **claim 4**, Petitioner alleges ineffective assistance of trial counsel for failing to raise prosecutorial misconduct or improper tapering with the evidence. (Cv-DE#1:16-17).

Petitioner's claim that his counsel was ineffective for failing to raise prosecutorial misconduct allegations is without merit. On August 9, 2011, an attorney for one of Petitioner's co-defendants provided the Government with a declaration executed by Jean Max Bellerive, who was Prime Minister of Haiti and acting

Minister of Justice and Public Safety at the time. (CR DE# 609). On August 10, 2011, the Government provided the declaration to counsel for Esquenazi and Rodriguez, shortly after the conclusion of the trial involving these two co-defendants. Petitioner's counsel received the declaration no later than August 24, 2011. (CR DE# 543-41). Although the declaration stated that "Teleco has never been and until now is not a State enterprise," this declaration was contrary to the position of the Haitian Government throughout the course of the instant investigation and prosecution, namely that Teleco was part of the public administration during the relevant time period. Additionally, Bellerive was unaware that his first declaration was to be used in a criminal bribery trial in the United States. The Haitian Government, and Mr. Bellerive in particular, offered to clarify its position on this issue. As a result of those conversations, the Government assisted Mr. Bellerive in preparing a second declaration, stating as such. (CR DE# 561). Accordingly, the United States helped Bellerive prepare a second declaration in which he clarified his position, stated that Teleco was part of the public administration of Haiti, and explained that the first declaration was prepared for internal purposes.

Petitioner asserts that Bellerive's second declaration is false and asks this Court to draw a conclusion that, because the Government admitted to assisting Bellerive in drafting his second declaration, "the government has, de facto, admitted to violating criminal laws." (CV DE# 1 at 17). He further argues that his counsel was ineffective for not raising a claim of prosecutorial misconduct. (Id. at 16).

Petitioner's current argument is similar to the argument he made on appeal in which he argued that the Government's actions

27

interfered with his right to call a witness, namely, Bellerive, at trial. Duperval, 777 F.3d at 1335. In rejecting Petitioner's argument, the Eleventh Circuit explained:

> That the government 'assisted Mr. Bellerive in preparing a second declaration' does not suggest that the government coerced or threatened Bellerive. The government of Haiti was cooperating with the investigation into corruption, so it is not suspicious that Bellerive clarified his statements after he realized the purpose of his declaration.

Id. Just as the Eleventh Circuit found no impropriety in the Government's actions, the Undersigned also finds that no improper conduct occurred and therefore Petitioner's counsel was not ineffective for not raising a prosecutorial misconduct claim. Defense counsel is not ineffective for failing to raise meritless arguments. Card v. Dugger, 911 F.2d 1494, 1520 (11th Cir. 1990).

Under **claim 5**, Petitioner alleges that the trial court lacked subject matter jurisdiction to try the case and/or impose sentence. (Cv-DE#1:12-14).

Under claim 1, Petitioner alleged that counsel was ineffective for failing to raise this claim. Now he makes a direct claim that the court lacked jurisdiction. (CV DE# 1 at 18-24). Petitioner misunderstands the concept of jurisdiction, citing the FCPA's affirmative defense of local written law as depriving the court of subject matter jurisdiction. (Id. at 19). In doing so, Petitioner modifies quotes from United States v. Iguaran, 821 F.3d 1335, 1336 (11th Cir. 2016). Iguaran involved the Maritime Drug Law Enforcement Act ("MDLEA") requirement that the defendant be aboard "a vessel subject to the jurisdiction of the United States." Iguaran, 821 F.3d at 1336; 46 U.S.C. §§70503(a)(1), 70506(b).

28

However, the MDLEA also states that "[j]urisdiction of the United States with respect to a vessel subject to this chapter is not an element of an offense" and that "[j]urisdictional issues arising under this chapter are preliminary questions of law to be determined solely by the trial judge." 46 U.S.C. §70504(a).

The FCPA contains no equivalent provision defining the lack of a local written law permitting the payment in question being a jurisdictional requirement. Indeed, the local written law provision is, explicitly, "an affirmative defense." 15 U.S.C. §§78dd-2©, 78dd-3©. Affirmative defenses must be raised by the defendant and proven by a preponderance of the evidence. See, e.g., United States v. Deleveaux, 205 F.3d 1292, 1299 (11th Cir. 2000). Even if successful, affirmative defenses do not "divest a district court of jurisdiction." United States v. Najjar, 283 F.3d 1306, 1309 (11th Cir. 2002) (noting that no court of appeals had held otherwise).

Failure to raise an affirmative defense at trial, such as the expiration of the statute of limitations, results in its waiver. This Court had subject matter jurisdiction over this case pursuant to 18 U.S.C. §3231, as the indictment charged "offenses against the laws of the United States," namely, money laundering and money laundering conspiracy. As described above, Petitioner's counsel's decision not to raise a local written law defense was not ineffective because that defense was without merit. Even if such a defense had merit, an affirmative defense is not a bar to subject matter jurisdiction. Furthermore, any affirmative local written law defense was waived when not raised at trial.

Under **claim 6**, Petitioner alleges that he was actually innocent of the money laundering charges. (Cv-DE#1:24-25). Petitioner reiterates his interpretation of the FCPA and Article

137 to conclude that he could not be guilty of the charged crimes because he was acting as a private individual, and thus no FCPA or Article 137 violation occurred. (CV DE# 1 at 24).

A "claim of 'actual innocence' in a §2255 context is usually viewed as a gateway through which a [movant] must pass to have his otherwise barred constitutional claim considered on the merits." Herrera v. Collins, 506 U.S. 390, 404 (1993). In the context of a §2255 motion, actual innocence may overcome a prisoner's failure to raise a constitutional objection on direct review. Bousley v. United States, 523 U.S. 614, 622 (1998). While Petitioner does not specify what procedural bar he seeks to overcome with his actual innocence claim, he nevertheless cannot establish actual innocence. To establish actual innocence, a movant must demonstrate that, "'in light of all the evidence,' it is more likely than not that no reasonable juror would have convicted him." Schlup v. Delo, 513 U.S. 298, 327-28 (1995). The exception is very narrow and requires "factual innocence, not mere legal insufficiency." Bousley, 523 U.S. at 623.

Petitioner argues again that he is not an official of a government instrumentality and, as a result, there could be no violation of the FCPA. He further argues he was not a Haitian government official for purposes of Haitian bribery law. (CV DE# 1 at 24-25). As discussed in detail above, there was overwhelming evidence of Petitioner's status as a Haitian government official. Furthermore, the Eleventh Circuit has ruled twice that the evidence submitted to the jury to find that Teleco was a government instrumentality, and that Petitioner was a government official, was sufficient. United States v. Esquenazi, 752 F.3d 912, 925 (11th Cir. 2014) and United States v. Duperval, 777 F.3d 1324, 133-34 (11th Cir. 2015). Petitioner has failed to submit any new evidence

to the contrary, and therefore, his claim of actual innocence
fails.

Petitioner ignores the fact that there was a third specified
unlawful activity for which he was convicted—wire fraud. The jury
convicted Petitioner of "knowing that the property involved in a
financial transaction represents proceeds of some form of unlawful
activity," "conduct[ing] . . . such a financial transaction which
in fact involves the proceeds of specified unlawful activity" while
knowing that the transaction was designed to conceal the nature,
location, source, ownership, or control of those proceeds. 18
U.S.C. §1956(a)(1)(B)(i). At trial, the Government proved that
Petitioner received and funneled his bribe money through wire
payments to the third party intermediaries and that these payments
were in exchange, in part, for Petitioner's assistance in depriving
Teleco of revenue, and thus laundered proceeds of wire fraud
violations. There was ample evidence that the scheme was conducted
through wires including telephone conversations, e-mail
correspondence, and faxed inbound statements. Therefore, even if
Petitioner had proven that he was not a Haitian government official
under the FPCA or Haitian bribery law, he would still be guilty of
laundering the proceeds of the wire fraud. Consequently,
Petitioner's claim of actual innocence is wholly without merit.

In conclusion, the record reflects that the petitioner
received vigorous and able representation more than adequate under
the Sixth Amendment standard. See Strickland v. Washington, 466
U.S. 668 (1984). Defense counsel made a reasonable investigation of
the facts, was well-prepared for trial, conducted full and
extensive cross-examination of the state's witnesses, made
appropriate objections, moved for judgment of acquittal, and
presented a forceful closing argument. Petitioner has, therefore,

failed to demonstrate that he was deprived of constitutionally effective assistance of counsel for any or all of the reasons alleged above. Petitioner is not entitled to federal habeas corpus relief on any of the claims presented.

Finally, it is noted that this court has considered all of the movant's claims for relief. See Dupree v. Warden, 715 F.3d 1295 (11th Cir. 2013)(citing Clisby v. Jones, 960 F.2d 925 (11th Cir. 1992)). For all of his claims, petitioner has failed to demonstrate that he is entitled to the relief requested. In other words, he has failed to satisfy Strickland's deficient performance and/or prejudice prong. Thus, to the extent a precise argument, subsumed within any of the foregoing grounds for relief, was not specifically addressed herein, the claim was considered and found to be devoid of merit, warranting no specific discussion herein.

## VII. **Evidentiary Hearing**

Movant is also not entitled to an evidentiary hearing on the claims raised in this proceeding. Movant has the burden of establishing the need for an evidentiary hearing, and he would only be entitled to a hearing if his allegations, if proved, would establish his right to collateral relief. See Schriro v. Landrigan, 550 U.S. 465, 473-75, 127 S.Ct. 1933, 1939-40, 127 S.Ct. 1933 (2007)(holding that if record refutes the factual allegations in the petition or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing). See also Townsend v. Sain, 372 U.S. 293, 307 (1963); Holmes v. United States, 876 F.2d 1545, 1553 (11th Cir. 1989), citing, Guerra v. United States, 588 F.2d 519, 520-21 (5th Cir. 1979)(holding that §2255 does not require that the district court hold an evidentiary hearing every time a section 2255 petitioner simply asserts a claim of ineffective assistance of counsel, and stating: "A hearing is not

required on patently frivolous claims or those which are based upon unsupported generalizations. Nor is a hearing required where the petitioner's allegations are affirmatively contradicted by the record.").

## VIII. <u>Certificate of Appealability</u>

A prisoner seeking to appeal a district court's final order denying his petition for writ of habeas corpus has no absolute entitlement to appeal, but must obtain a certificate of appealability ("COA"). <u>See</u> 28 U.S.C. §2253(c)(1); <u>Harbison v. Bell</u>, 556 U.S. 180, 129 S.Ct. 1481 (2009). This Court should issue a certificate of appealability only if the petitioner makes "a substantial showing of the denial of a constitutional right." <u>See</u> 28 U.S.C. §2253(c)(2). Where a district court has rejected a petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. <u>See</u> <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).

However, when the district court has rejected a claim on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." <u>Id</u>. Upon consideration of the record as a whole, this Court should deny a certificate of appealability. Notwithstanding, if petitioner does not agree, he may bring this argument to the attention of the district judge in objections.

## IX. <u>Conclusion</u>

For all of the foregoing reasons, is therefore recommended that this motion be DENIED on the merits; that no certificate of appealability issue; and, that the case be closed.

Objections to this report may be filed with the Chief Judge within fourteen days of receipt of a copy of the report.

SIGNED this 6th day of February, 2018.

UNITED STATES MAGISTRATE JUDGE

cc:  Jean Rene Duperval
     Reg. No. 82799-004
     McRae Correctional Institution
     Inmate Mail/Parcels
     Post Office Drawer 55030
     McRae Helena, GA 31055

     Aurora Fagan
     United States Attorney's Office
     99 NE 4 Street
     Miami, FL 33132
     561-820-8711
     Fax: 561-209-1787
     Email: aurora.fagan@usdoj.gov